FILED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

02 SEP 27 PM 4: 07

U.S. DISTRICT COURT
N.D. OF ALABAMA

SHARON Y. BLAYLOCK,        }
                           }
    Plaintiff,             }
                           }
v.                         }        CASE NO. CV 00-B-3614-S
                           }
ALABAMA  GAS  CORPORATION; }
ENERGEN CORPORATION,       }
                           }
    Defendants.            }

ENTERED

SEP 27 2002

<u>**MEMORANDUM OPINION**</u>[1]

Currently before the court is plaintiff Sharon Y. Blaylock's ("Blaylock") Motion for

Summary Judgment on her claim under the Uniformed Services Employment and Reemployment

Rights Act of 1994, 38 U.S.C. §4311 ("USERRA"). Also before the court is the Motion for

Summary Judgment filed by defendants Energen Corporation ("Energen") and Alabama Gas

Corporation's ("Alabama Gas" or "the Company"), and defendants' Motion to Strike certain

affidavit testimony submitted by Blaylock.

This lawsuit arises out of Blaylock's former employment at Alabama Gas where she

worked from February 1996 until July 2000. Blaylock alleges that Energen and Alabama Gas

---

[1]At the conclusion of oral argument, the court informed the parties of its intention to grant
summary judgment in favor of defendants. The court requested that counsel for defendants prepare
a proposed memorandum opinion for the court and required that counsel send a copy of the proposed
opinion to counsel for plaintiff. Although the court has made some changes to the opinion prepared
by defendants' counsel, it has adopted a large part of the proposed opinion. The court is aware of
the admonition of the Eleventh Circuit that district courts not delegate "the task of drafting important
opinions to litigants." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n. 46 (11th Cir.
1997). This is an important opinion. The court had reached a firm decision as to the appropriate
outcome before requesting a proposed opinion from defendants' counsel. In this case, however, the
defendants drafted the opinion according to the express instructions of the court as to its contents.
These instructions were stated to defendants' counsel, with plaintiff's counsel present, following oral
argument. Although largely taken from the opinion proposed by defendants' counsel, the court
personally reviewed this opinion and the opinion reflects the court's own conclusions.



terminated her because of her military status and/or obligations in violation of USERRA. She also claims that Energen and Alabama Gas discriminated against her on the basis of her African-American race by discharging her in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, ("Section 1981".)

## I. FACTUAL SUMMARY

### A.    Defendants' Organizational Structure

Alabama Gas is a natural gas distribution company. (Carr Aff., ¶ 2.) Energen, an Alabama corporation, is the parent company of Alabama Gas. (Carr Aff., ¶ 2.) Energen operates with its own funds independently from Alabama Gas. (Carr Aff., ¶ 3.) Alabama Gas issues paychecks that bear the name "Alagasco/Energen" (Blaylock Dep. at 224.) Alabama Gas and Energen use the same employee manual. (Bearden Dep. at 169-171.) Alabama Gas has sixteen officers, six of whom are also Energen officers. (Carr Aff., ¶ 3.) However, Alabama Gas independently controls its day-to-day labor practices. (Carr Aff., ¶ 4.)

### B.    Blaylock's Work History with Alabama Gas

Blaylock worked for Alabama Gas from February 2, 1996 until the termination of her employment on July 21, 2000. (Blaylock Dep. at 95-96, 69-70.) During this four-year period Blaylock held a number of positions, the last of which was a Customer Service Representative position at the Midtown Business Center in Birmingham. (Blaylock Dep. at 95-101.) Blaylock, who is African-American, has been a member of the U.S. Army Reserves since 1996. (Blaylock Dep. at 23.) On the personnel data sheet she completed for Alabama Gas at the time of her hire, Blaylock disclosed her status as a reservist. (Blaylock Dep., DX2.) Throughout her employment at Alabama Gas, Blaylock requested and took military leave a number of times without any

complaint from Alabama Gas.[2] (Blaylock Dep. at 107-108; Amended Complaint, ¶¶ 11-13.)  On
all of those occasions, Alabama Gas paid Blaylock for her leave.  (DiChiara Aff., ¶ 5.)

Blaylock took five days of leave in June 2000 to perform her active duty with the
reserves.  Sometime after she returned from her leave, Alabama Gas's Payroll Department asked
her to  submit documentation of her military earnings for her June duty, such as a Leave and
Earnings Statement ("LES"), so they could offset her pay. (Blaylock Dep. at 157-159;
Washington Dep. at 16-18; Hudson Dep. at  9-10, 17-19.)  Alabama Gas had already paid
Blaylock for those five days.  (Blaylock Dep. at 168.)   According to defendant, Blaylock's
response to this and subsequent requests regarding her military earnings ultimately led to her
termination. (Bearden Dep. at 86, 118, 121, 217.)

C.     **Alabama Gas's Policy Regarding Employee Military Leave**

Alabama Gas has many employees who regularly take military leave and has practices in
place to address such leave. (Bearden Aff., ¶ 3; DiChiara Aff., ¶¶ 3-4.)  As a general matter,
Alabama Gas pays employees taking military leave the difference between their military pay and
regular salary. (Bearden Aff., ¶ 3.)  Accordingly, Alabama Gas requires employees to submit
documentation of their military pay, so it can calculate the appropriate offset.  (Bearden Aff., ¶
3.)  For example, if Employee A requests and takes military leave for 10 days, Alabama Gas
pays Employee A her regular salary for that 10 days.  When Employee A returns to work, she
turns in an LES, or some other documentation, reflecting the salary she received for her military
leave, and Alabama Gas deducts the amount of the military pay from a subsequent paycheck.
(Bearden Aff., ¶ 4.)

---

[2]      According to Alabama Gas's payroll records for Blaylock, in the year before her termination,
Blaylock requested and received 11 days of military leave, not including the five days she took in
June 2000. (DiChiara Aff., ¶ 5.)

Employees who take military leaves of 10 days or less have the option of avoiding the offset, but only if they deduct the military leave time from their vacation or paid leave "bank" (assuming they have sufficient time saved in their bank). (Bearden Aff., ¶ 5.)  For example, Employee B requests and takes 5 days of military leave.  Alabama Gas pays Employee B for that time.  If Employee B does not want to be offset, she can deduct five days from her vacation or paid leave bank. (Bearden Aff., ¶ 5.)  If she does not charge the time to her bank, Employee B must turn in an LES and Alabama Gas will offset her pay on a subsequent paycheck.  (Bearden Aff., ¶ 5.)

Prior to June of 2000, because of an apparent oversight by Alabama Gas, Blaylock, as well as other employees, took military leave without charging it against her vacation or leave banks or having her military pay offset on a subsequent paycheck.  (Hudson Dep. at 15-17; DiChiara Aff., ¶¶ 5-6.)  The company caught this mistake in 2000.  (DiChiara Aff., ¶ 6.) Alabama Gas did not attempt to recover any prior offsets; rather, it determined to make sure it properly executed the offset in the future.  (Franklin Dep. at 47-48, 50-52; DiChiara Aff.,¶ 6.)

**D.**     **Blaylock's Representations Concerning her June 2000 Military Earnings**

Alabama Gas's first attempt to obtain documentation regarding Blaylock's June 2000 military earnings occurred on July 7, 2000.  Juanita Hudson, a Payroll Assistant, sent an e-mail to Blaylock's supervisor, Pat Washington, seeking Blaylock's earnings statement.  (Hudson Dep. at 9-11.)  Washington passed the message along to Blaylock[3] and Blaylock called Hudson about the matter. (Blaylock Dep. at 157-158; Hudson Dep. at 18-20.)  Blaylock told Hudson she would not receive an earnings statement:

---

[3]     Blaylock's supervisor, Washington, recalls asking Blaylock for an earnings statement from her military leave. (Washington Dep. pp. 16-17.)  Blaylock asked why did the Company need an earnings statement -- that she did not "make any money that [the Company] need[ed] to know about." (Washington Dep. at 16-18.)

| Juanita: | Hey, yes, um, and in the past, I don't think that you have been sending it in, but it's supposed [to] be, I guess, it just would never said nothing was ever said about so my supervisor was like make sure you get |
|---|---|
| Blaylock: | Cause we don't have no compensation.  The only thing that we get drill.  We have the drill one weekend out the month and that is taken out of that so we don't have anything called compensation. |
| Juanita: | Like I just got a sheet from somebody |
| Blaylock: | Um huh. |
| Juanita: | I mean somewhere else |
| Blaylock: | Um hum |
| Juanita: | But they sent me a, um, earnings statement and it has on there whatever, |
| Blaylock: | Yeah, that's if I was active.  But I am not active, I am just part-time.  They will send that like that, that's if I was active. |
| Juanita: | Okay. |
| Blaylock: | But I'm not active. |

(Audiotape, Plaintiff's Transcript ["Pl. Tr.] at 2.)[4]

Hudson reported to Lucy DiChiara that Blaylock told her she would not receive an LES

for her June duty because she was not on active duty.  (Hudson Dep. at 19-20; DiChiara Aff.,

¶ 7.)  DiChiara then followed up with Blaylock.  (Blaylock Dep. at 160-161, 165; DiChiara Aff.,

¶ 9.)  According to Blaylock, she told DiChiara that she never had to turn in an LES before and

that "she never went over [her] 10 days."  (Blaylock Dep. at 165.)  DiChiara also understood

Blaylock to say that she would not receive a separate payment for her June duty because the

Army spread Blaylock's payment out over twelve months.  (DiChiara Aff., ¶ 9; Audiotape, Pl.

---

[4]     As a customer service representative, Blaylock's telephone conversations at her work station were recorded.  Defendant produced an audiotape of conversations relating to Blaylock's military pay and Blaylock submitted the tape into evidence.  (Ct. File, Doc. 25.)  The court requested that the plaintiff and defendants each file a transcript of the tape, which they did.  (Ct. File, Doc. 77, Pl.'s Tr.; Doc. 78, Def.'s Tr.)

Tr. at 3.)  In DiChiara's experience, other employees taking [military] leave, when asked for earnings statements, had simply submitted either an LES or some other document reflecting their military pay for the leave period.  (DiChiara Aff., ¶ 7.)

At this point, DiChiara sought assistance from Karen Bearden, a Manager in the Human Resources Department.  (Bearden Dep. pp. 59-62.)  DiChiara told Bearden that Blaylock had indicated she would not receive an LES for her June duty and that her pay for that duty would be spread out over the entire year. (DiChiara Aff., ¶ 10.)  Bearden was knowledgeable about Alabama Gas's paid leave bank policy and its interaction with military leave.  (DiChiara Aff., ¶ 9; Bearden Dep. at 128-132; 195-197.)  Accordingly, in an effort to clear up the matter, Bearden spoke with Blaylock on or about July 12, 2000.  (Bearden Dep. p. 61.)  Bearden, like DiChiara and Hudson, understood Blaylock to say that she would not receive a separate LES or check for her June duty, and that her pay for that duty would be spread over the year.  Blaylock stated:

| Blaylock: | Okay but um, Juanita had called me and she had well actually she had sent an e-mail to Pat and said to send my um LES earnings |
|---|---|
| Karen: | Uh huh |
| Blaylock: | And I told her I didn't I never sent that and I don't have nothing like that cause we don't do the two you know how some people do the whole two week training. |

(Audiotape, Pl. Tr. at 16)

| Blaylock: | Okay cause what we do we okay what we get is we get paid uh, like the two days whether its one weekend out of the month |
|---|---|
| Karen: | mmm mmm |
| Blaylock: | And then we get the two weeks.  All that is added to the amount that we get every month |
| Karen: | Monthly |
| Blaylock: | Yes ma'am and that's why I was trying to explain to her |
| Karen: | Okay |

Blaylock:      We don't get it like

Karen:         At the time you work it

Blaylock:      Yes

Karen:         It's just divided up over the year

Blaylock:      Over the year

(Audiotape, Pl. Tr. at 17.)[5]

Blaylock faxed Bearden an earnings statement for April 2000 showing earnings of $244, and Bearden understood Blaylock to represent that this LES accurately reflected what Blaylock earned every month. (Bearden Aff. ¶ 6; Bearden Dep. at 48-50; Blaylock Dep., DX12.)  Given that Blaylock indicated she would not receive an LES reflecting her June duty, Bearden attempted to calculate Blaylock's hourly earnings using the April LES. (Bearden Dep. at 48-50; Bearden Aff., ¶¶ 6-7; Audiotape, Pl. Tr. at 20-22.)  Based on Blaylock's representation that she received $244 per month from the Army, Bearden attempted to calculate what part of her earnings over the year represented the pay for her June duty. (Bearden Dep. 48-53; Audiotape, Pl. Tr. at 20-22.)  By making a number of assumptions regarding the number of days and hours Blaylock typically worked in a year, Bearden calculated an estimated hourly rate for Blaylock's military duty. (Bearden Aff., ¶ 7; Audiotape, Pl. Tr. at 20-22.)  Bearden reviewed these assumptions and calculations with Blaylock, and Bearden's calculations indicated that Blaylock's hourly rate in the military exceeded her hourly rate at Alabama Gas. (Bearden Dep. at 48-53; Audiotape, Pl. Tr. at 22.)  Given that Blaylock's June military pay apparently would exceed her Alabama Gas pay for the same week, Bearden explained that Blaylock was not due an offset--rather, her entire salary for that week would be offset. (Bearden Aff., ¶ 7; Audiotape,

---

[5]      Blaylock also stated that her military pay would include reimbursements for dependents and educational reimbursements. (Bearden Dep. at 54, 57-58; Audiotape, Pl. Tr. at p. 22.)

Pl. Tr. at 23, 24.) Bearden told Blaylock that the hours she was gone from work on military leave would be deducted from her subsequent paycheck. (Bearden Aff., ¶ 7; Audiotape, Pl. Tr. at 25.)

Blaylock told Bearden that she could not afford to have Alabama Gas offset her pay all at once. (Blaylock Dep. at 174; Audiotape, Pl. Tr. at 25, 26.) Bearden told Blaylock that she would check with Payroll to see about how to arrange the deduction so it would be spread out over the year. (Bearden Aff., ¶ 8; Audiotape, Pl. Tr. at 32.)

In an attempt to create a disputed fact as to what Blaylock actually told Alabama Gas concerning her military pay, plaintiff cites selected words and incomplete sentences from the audiotape containing recorded conversations between Blaylock and others concerning her military pay. (*See* Plaintiff's Brief at 5.) Blaylock takes these selected words from the tape to suggest that she actually told Alabama Gas that she would get paid for the entire amount of her leave and that she would forward these documents, including her LES, to Bearden. However, the audiotape reveals that Blaylock said on more than one occasion that she would in fact not receive separate payment for her annual leave; that her pay was spread out over the entire year. (*See* Audiotape, Pl. Tr. at pp. 2, 3, 10, 17.)

Blaylock also submitted the affidavit of Sgt. Parker who testified that she told Bearden that Blaylock had requested that Parker forward her LES to Alabama Gas when it arrived. (Parker Aff. ¶ 13.) Defendants have moved to strike this portion of the affidavit as constituting impermissible hearsay. Even crediting Parker's testimony, however, the evidence remains undisputed that Blaylock told at least three Alabama Gas employees, Hudson, DiChiara and Bearden that she would not receive separate compensation or an LES for her June leave.

**E.** **Alabama Gas's Investigation and Termination of Blaylock**

Bearden was suspicious about Blaylock's representations concerning her pay because other Alabama Gas employees who took military leave generally submitted a separate LES for that leave. (Bearden Dep. at 64, 67; DiChiara Aff., ¶ 7.) Accordingly, Bearden spoke with DiChiara to collect more information. (Bearden Aff., ¶ 9.)

DiChiara spoke with several people at Blaylock's army reserve unit, including a Sgt. Mercado, (DiChiara Aff., ¶ 11)[6] and from these conversations understood that Blaylock would, in fact, receive a separate payment for her June training. (DiChiara Aff., ¶ 11.) Given that it appeared Blaylock was lying about her military pay in an effort to avoid the offset, Bearden discussed the situation with Anne Powers, the manager over Alabama Gas's Midtown Business Center. (Bearden Dep. at 26, 109.) They discussed whether they needed to discipline Blaylock for the misrepresentation. (Bearden Aff., ¶ 10; Powers Aff., ¶ 3.)

At Bearden's request, Powers talked with Blaylock's immediate supervisor, Pat Washington, to determine if Blaylock had any other performance problems. (Washington Dep. at 31; Powers Aff., ¶ 4.) Washington told Powers that her only concern about Blaylock's performance, and it had not yet become a problem, was that Blaylock was dishonest at times. (Washington Dep. at 31.) Washington told Powers that if there was another problem with Blaylock, she did not object to her termination. (Washington Dep. at 35.) Washington gave Powers documents from her desk file regarding two incidents in which Washington felt that Blaylock lied about her work in the previous six months. (Powers Aff., ¶ 5.) Powers later sent those documents to Bearden. (Bearden Dep. at 28-31; Bearden Aff., ¶ 12.)

---

[6]    DiChiara also testified that she spoke with a Sgt. Parker at Blaylock's reserve unit. Parker denies speaking with DiChiara; however, this dispute is not material, given the undisputed conversation between DiChiara and Sgt. Mercado.

Powers also spoke with Bill Bibb, Alabama Gas's Vice President of Birmingham Operations, concerning the appropriate disciplinary action. (Bearden Dep. at 26, 107-108, 119, 121; Powers Aff., ¶ 6.) Bibb stated that if they confirmed that Blaylock was misrepresenting facts for financial gain at the expense of the Company, it was a terminable offense, assuming Blaylock did not own up to her dishonesty. (Bibb Aff., ¶ 3; Powers Aff., ¶ 6; Bearden Dep. at 121.)

Bearden also discussed the situation with Jim Franklin, Alabama Gas's Director of Human Resources. (Bearden Dep. at 108-110.) Franklin and Bearden agreed that Bearden should get further information from the military to determine if Blaylock was, in fact, misrepresenting the facts. (Franklin Dep. at 27-28.) Additionally, Bearden was to meet with Blaylock and ask her again to tell them how and whether she would be paid for her military leave. (Bearden Dep. at 109-111.) If Blaylock was truthful, she would not be terminated. (Bearden Dep. at 105.) However, if Blaylock continued to misrepresent the situation, her employment with Alabama Gas would be terminated. (Bearden at 109-112; *see* Franklin Dep. at 34-35.)

DiChiara talked to Blaylock's unit and requested that they fax her a written statement confirming that Blaylock would receive an LES covering her June duty. (DiChiara Aff., ¶ 12.) When DiChiara had still not received the information from the unit on Friday morning, July 21, 2000, Bearden contacted Sgt. Billits and a JAG officer, John Grimes. (Bearden Dep. at 40, 44.) Both Billits and Grimes reiterated that Blaylock would receive separate pay for her annual training and that she would receive an LES covering that duty. (*Id.* at 40, 44-46, 71-73, 77-78.)

On July 21, 2000 Bearden and Powers met with Blaylock. (Bearden Dep. at 109-110; Blaylock Dep. at 209-210.) Bearden and Powers told Blaylock that they had confirmed with her unit that she would, in fact, receive separate payment and an LES covering her June duty.

(Bearden Aff., ¶ 14; Powers Aff., ¶ 8.) Blaylock denied that she had misrepresented her military situation. (Blaylock Dep. at 210.) Bearden and Powers felt that Blaylock exhibited a "pattern of not telling the truth" which included the false statements about her military pay, as well as the two documented incidents about which Washington had informed them. (Bearden Dep. at 100-101.) According to defendant, based on this dishonesty, Alabama Gas terminated Blaylock's employment. (Bearden Dep. at 86, 98, 100-101, 118, 121, 217; Franklin Dep. at 27-29, 33-35.)

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, "summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986.) The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; see Fed.R.Civ.P. 56(a) and (b). Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324. Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989.) Furthermore, the court must

"view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988.) Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in her favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only reasonable inferences. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988.)

## III. DISCUSSION

### A.   Claims against Energen

Energen moved for summary judgment on the basis that it is not a proper party because it was not Blaylock's employer and had no involvement in any decisions regarding her employment. The undisputed facts demonstrate that Blaylock never worked for Energen. Her only connection to Energen was that she was an Alabama Gas employee and Alabama Gas is a wholly-owned subsidiary of Energen. (*See* Carr Aff., ¶ 2.) The individuals involved in the decision to terminate Blaylock were all Alabama Gas employees: Bill Bibb, Karen Bearden, Anne Powers, and Jim Franklin. (Bearden Dep. at 12; Franklin Dep. at 6; Bearden Aff., ¶ 2; Carr Affidavit, ¶ 4.) None of these individuals work for Energen. *Id.* The undisputed facts indicate that no Energen employee played any role in the decision at issue.

Therefore, the only way Blaylock could recover damages from Energen is by demonstrating that Alabama Gas and Energen should be treated as either a single or joint employer. *See Lyes v. City of Riviera Beach, Florida,* 166 F.3d 1332, 1341-42 (11th Cir. 1999.) The predominant trend in discrimination actions to determine whether two or more businesses should be treated as a single or joint employer is to apply the standards promulgated by the

National Labor Relations Board. *See Lyes*, 166 F.3d at 1341-42; *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987) (citations omitted.)  The NLRB factors are (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. *See Lyes*, 166 F.3d at 1341. While each of the NLRB factors is "indicative of interrelation and while control over the elements of labor relations is a central concern, . . . the presence of any single factor in the Title VII context is not conclusive." *Lyes*, 166 F.3d at 1341 n.5 (citing *Ambruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir. 1983).

To treat multiple corporate entities as a single or joint employer, a plaintiff must show that the parent corporation exercised a degree of control which exceeded the control normally exercised by a parent corporation which is separate and distinct from the subsidiary corporate entity. *See Ambruster*, 711 F.2d at 1338.  To satisfy this threshold, a plaintiff must present evidence that the defendant corporations are "'highly integrated with respect to ownership and operations.'" *Lyes*, 166 F.3d at 1341 (quoting *McKenzie*, 834 F.2d at 933 (quoting *Fike v. Goldkist, Inc.*, 514 F. Supp. 722, 726 (N.D. Ala. 1981), *aff'd*, 664 F.2d 295 (11th Cir. 1981))).

To establish interrelation of operations, a plaintiff must show more than that the top officer of the subsidiary reports to an officer in the parent corporation.  Similarly, it is not enough for a plaintiff to show that the parent corporation eventually receives benefits from the subsidiary's work. *See Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993).  Rather, a plaintiff must, for example, produce evidence of combined accounting records, combined bank accounts and lines of credit, and sharing of services and employees. *See, e.g., McKenzie*, 834 F.2d at 933-34 (finding that parent's operations were interrelated with subsidiary where parent officers and subsidiary's officers were the same and where parent kept subsidiary's financial

books and paid its bills).   In this case, the undisputed facts indicate that Energen operates independently from Alabama Gas and with its own funds.  (Carr Aff., ¶ 3.)

Courts have also looked at whether the two companies have common officers and common ownership. *See Lyes,* 166 F.3d at 1341; *McKenzie,* 834 F.2d at 933-34.  The fact that Alabama Gas is a wholly-owned subsidiary is not sufficient. *Frank,* 3 F.3d at 1364.  Similarly, courts have held that "some overlap of officials" between the parent and its subsidiary does not necessarily translate to common management. *Fike,* 514 F. Supp. at 727 (citations omitted). Although Alabama Gas is a  wholly-owned subsidiary of Energen, Alabama Gas has its own managers and officers separate from Energen.  Of Alabama Gas's sixteen officers, only six are also Energen officers.  (Carr Aff., ¶ 3.)  Under these facts, the "interrelation of operations" factor is not present. *See, e.g., Frank,* 3 F.3d at 1364; *Fike,* 514 F. Supp. at 727.

The centralized control of labor relations prong of the NLRB test is the most critical of the four. *See Fike,* 514 F. Supp. at 727.  To satisfy this prong, a plaintiff needs to show more than a parent's broad general policy statements regarding employment matters of the subsidiary. *See Frank* , 3 F.3d at 1363.  Rather, a plaintiff must show the parent's day-to-day actual and active control of the subsidiary's employment decisions. *See id.* "It is well settled that the 'control' required to meet . . . [this prong] is not potential control, but rather *actual and active control of day-to-day labor practices.*" *Fike,* 514 F. Supp. at 727 (emphasis added).  The critical inquiry under this prong is "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983).

Notwithstanding Blaylock's attempt to add Energen to this dispute, no fact exists to support a claim that Energen played any role in the matters at issue.  Significantly, all of the people involved in the decision to terminate Blaylock's employment are Alabama Gas

14

employees. (Bearden Dep. at 12; Franklin Dep. at 6; Bearden Aff. ¶ 2, Carr Aff., ¶ 4.) *See*

*Llampallas v. Mini-Circuits Lab, Inc.,* 163 F.3d 1236, 1244-45 (11th Cir. 1998) (rejecting single

or joint employer theory because condominium association played no role in adverse

employment decision and "made no decisions that affected the terms and conditions of

[plaintiff's] employment . . ."). Although Blaylock points out that her paycheck bears the name

of both entities (Pl.'s Brief ¶ 7; Blaylock Dep. at 224), the only evidence before the court is that

Alabama Gas and Energen operate independently and maintain separate funds. (Carr Aff. ¶¶ 3.)

Blaylock offers no evidence to show that Energen controls Alabama Gas's actual day-to-day

implementation of those policies. (*See* Carr. Aff. ¶ 4.) The evidence does not show that Energen

exercises a degree of control that exceeds the control normally exercised by a parent corporation

that is separate and distinct from its subsidiary. *See Fike*,  514 F. Supp. at 727.

Application of the NLRB factors in this case do not reveal the highly integrated

ownership and operations which is necessary to find single or joint employer status. *See Lyes*,

166 F.3d at 1341-42; *McKenzie*, 834 F.2d at 933.  Accordingly, the court finds that Energen is a

distinct entity from Alabama Gas, and Blaylock's claims against Energen are due to be

dismissed.


**B.**     **USERRA Claim**

USERRA was enacted in 1994, in part, "to prohibit discrimination against persons

because of their service in the uniformed services." 38 U.S.C. §4301(a)(3).   USERRA prohibits

an employer from denying any benefit of employment, including retention of employment, to a

member of the uniformed services on the basis of his or her military status or obligations. 38

U.S.C. §4311(a), (c)(1); *see Hill v. Michelin North America, Inc.*, 252 F.3d 307, 311 (4th Cir.

2001).

The predecessor to USERRA, the Vietnam Era Veterans Readjustment Assistance Act of 1974, only prohibited acts of discrimination that were motivated solely by an employee's reserve status. *See Monroe v. Standard Oil Co.*, 452 U.S. 549, 559 (1981). In an attempt to expand the protection afforded to employees in the military, USERRA prohibits discriminatory actions where the employee's military status is a "motivating factor" in the decision, even if the employee's military status is not the sole factor in the decision. *See* 38 U.S.C.A. § 4311(c)(1); *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1012-13 (Fed. Cir. 2001).

Thus, an employee making a USERRA claim bears the initial burden of "showing by a preponderance of the evidence that the employee's military service was 'a substantial or motivating factor' in the adverse employment action." *See Sheehan*, 240 F.3d at 1013 (noting that legislative history adopts burdens of proof for actions under National Labor Relations Act as explained by Supreme Court in *National Labor Relations Bd. v. Transp. Mgmt. Corp.*, 462 U.S. 393, 400-01 (1983) (modified by *Director, Office of Workers' Comp. v. Greenwich Collieries*, 512 U.S. 267 (1994)) (citation omitted). A plaintiff may prove discriminatory motive by either direct or circumstantial evidence. *Sheehan*, 240 F.3d at 1014. If the evidence is circumstantial, motive "may be reasonably inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members [of the military] together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." *Id.*

If the employee-plaintiff successfully bears this burden, the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for valid reasons. *See Sheehan*, 240 F.3d

16

at 1013-1014. "Thus the USERRA provides that even if prohibited discrimination was a factor, the employer does not violate the statute if 'the employer can prove that the action would have been taken in the absence of [military status].'" *Id.* at 1013 (citing 38 U.S.C. § 4311(c)(1)) (brackets in original).[7]

To satisfy her initial burden, Blaylock must prove that Alabama Gas "relied on, took into account, considered or conditioned the termination of [her] employment to the fact that [she] was a member of the [reserves]." *Barreto v. ITT World Directories, Inc.*, 62 F. Supp. 2d 387, 391 (D. P. R.1999); *see also Sanguinetti v. UPS*, 114 F. Supp. 2d 1313, 1318 (S.D. Fla. 2000). Thus, Blaylock must show by a preponderance of the evidence that her military status was a motivating factor in Alabama Gas's decision to terminate her employment. *See Sheehan*, 240 F.3d at 1013. Here, Blaylock has presented no evidence on which a reasonable jury could infer such a motive. The record suggests no animus on the part of the decision makers against Blaylock's status or participation as an Army Reservist. The undisputed evidence establishes that Alabama Gas knew that Blaylock was a member of the military when it hired her. (Blaylock Dep., DX2.) Additionally, Blaylock never noticed any animus toward her military status. (Blaylock Dep. at 114-119.)

The temporal proximity of the termination to the leave is not enlightening in this instance. Although Alabama Gas terminated Blaylock four weeks after her June leave, she had taken leave long before June 2000. She had repeatedly taken approved military leave without incident. (Blaylock Dep. at 107-108; Washington Dep. at 15-16.) In fact, over the course of her four years of employment, Blaylock took numerous military leaves and still received salary

---

[7]     The burden-shifting under USERRA has been held to be different from that in discrimination cases under Title VII because the Title VII *McDonnell Douglas* framework "does not shift the burden of persuasion to the employer." *Sheehan*, 240 F.3d at 1014-15.

increases and promotions. (Blaylock Dep. at 97-101, 107-108, 133-134.) None of this conduct

indicates animus towards Blaylock because of her military obligations. *See Daggett v. Chicago*

*Transit Auth.*, 1998 WL 831848 at * 10 (N.D. Ill. 1998) (holding that even when plaintiff was

terminated the day before he was to begin military obligations, the initial case was not

established because plaintiff's prior military leaves "negat[ed] any suggestion that defendant had

an animus towards plaintiff's military status and his obligations relating thereto.").

Blaylock argues that the decision to terminate her employment necessarily violated

USERRA because the subject matter of her dishonesty related to her military leave pay. In other

words, Blaylock's argument is that, but for the fact she was in the military, the issue about which

she was dishonest would not have arisen; therefore, Blaylock's military status was a factor in the

decision. The court is not persuaded by this argument.

Blaylock's contention is not unlike the plaintiff's argument in *Armindo v. Padlocker,*

*Inc.*, 209 F.3d 1319 (11th Cir. 2000), in which the Eleventh Circuit held that the Pregnancy

Discrimination Act "is not violated by an employer who fires an employee for excessive

absences, even if those absences were the result of the pregnancy, unless the employer overlooks

the comparable absences of non-pregnant employees." *Id.* at 1320. Likewise, the First Circuit

Court of Appeals rejected the argument that plaintiff's termination violated Title VII because the

employer would not have learned that her position was unnecessary had she not become

pregnant and taken pregnancy leave. *See Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 423 (1st

Cir. 1996). By analogy to *Armindo* and *Smith*, even though Blaylock's veracity would not have

been at issue had Blaylock not been in the military, no evidence suggests that animus against her

participation or status in the military motivated Alabama Gas's decision. It was Blaylock's

perceived dishonesty that Alabama Gas viewed as problematic, not the fact that she was in the

military.

Likewise, no evidence in the record suggests disparate treatment of employees with similar offenses.  In the record before the court, the individual with the most similar behavior to Blaylock's was Tiffany McDade.  Bearden came to the conclusion that McDade had misrepresented her need to take extended leave. (Bearden Dep. at 33-34, 37-38.)  When Bearden learned of the misrepresentation, she confronted McDade.  When McDade did not admit to the misrepresentation, Bearden recommended termination, although McDade was ultimately given the opportunity to resign in lieu of termination. (Bearden Aff., ¶ 15.)  Another employee the Company terminated for dishonesty was Mary Odom.  In that case, Odom denied certain unacceptable conduct in front of a customer. (Powers Aff., ¶ 9.)  When the Company confirmed from other sources that Odom had, in fact engaged in the behavior, and Odom continued to deny her wrongdoing, it terminated her employment. (Powers Aff., ¶ 9:)  Neither McDade nor Odom had military obligations.

Although Blaylock claims that three white marketing employees, Robert Nichols, Kerry Gott and Linda Davis (the "TIPS employees"), were treated more favorably than she,[8] the TIPS employees were not similarly situated to Blaylock in a number of respects.  Alabama Gas disciplined the TIPS employees for misinterpreting the "TIPS" program (a bonus program) and inappropriately taking credit for new gas customers. (Franklin Dep. at 17-19.)  Upon investigation, Franklin determined that they were accepting money from the Company to which they were not entitled, but because they apparently misinterpreted the policy, not because of intentional dishonesty on their part. (Franklin Dep. at 20-21.)  Thus, the "infraction" committed

---

[8]    Blaylock argues that Alabama Gas's Human Resources Director, Jim Franklin, agrees that "the TIPS employees are proper comparators for her (Blaylock) with respect to both her USERRA and race claims." (Plaintiff's Brief at 13.)  To the contrary, Mr. Franklin testified to significant *differences* between Blaylock's situation and that of Nichols, Gott, and Davis. (Franklin Dep. at 52-53; Franklin Aff. ¶ ¶ 3-7.)

by Davis, Gott, and Nichols was significantly different than Blaylock's perceived misconduct. *See Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311-12 (11th Cir. 1998), *opinion modified* by, 151 F.3d 1321 (11th Cir. 1998) (agreeing that plaintiff, who was terminated for reporting to work out of uniform and for insubordination, was not similarly situated to a white employee not terminated for an attendance violation); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984) (holding that plaintiff must show misconduct was "nearly identical" to that engaged in by an employee outside of the protected class).

Furthermore, when confronted with the possible misconduct, Davis, Gott, and Nichols "were cooperative." (Franklin Dep. at 52-53.) All three TIPS employees admitted having taken credit for the customers and did not try to hide their conduct. (Franklin Dep. at 20-22.) The fact that three different employees at two different locations similarly misinterpreted the policy demonstrated the policy's ambiguity. (Franklin Aff., ¶ 5.) On the other hand, Blaylock apparently misrepresented her pay status to at least three Alabama Gas employees. (Hudson Dep. at 18-20; DiChiara Aff., ¶ 9; Bearden Dep. at 52, 54, 57-58, 60-61, 74, 77, 109-110.) Unlike the TIPS employees, the issue was not her interpretation of an ambiguous policy--it was her explanation of her military pay. Testimony from two of the decisionmakers indicates that, had Blaylock been honest about her military earnings, even as late as the day of her termination meeting with Bearden and Powers, she probably would not have been terminated. (Bearden Dep. at 109-112; Franklin Dep. at 33-35.) Thus, Blaylock, who appeared to continue with her dishonesty even when confronted, is not similarly situated to Davis, Gott, and Nichols, who cooperated with Alabama Gas and admitted their mistakes. *See Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000) (finding that employee who innocently "temporarily misplaced funds" from cash register was not similarly situated to plaintiff, who admitted to taking money from

cash register).

Additionally, the TIPS employees had very different histories with the Company than Blaylock. All three TIPS employees were long-term employees of Alabama Gas: Davis since 1967, Gott since 1983, and Nichols since 1977, with good work records. (Franklin Aff., ¶ 6.) In fact, the incident regarding the TIPS program was the first documented act of an accusation of dishonesty on the part of all three TIPS employees. (Franklin Aff., ¶ 6.) Blaylock, on the other hand, had been employed by Alabama Gas for only four years at the time of her termination. (Blaylock Dep. at 95-96, 69; *see* Franklin Dep. at 52-53.) In contrast to the TIPS employees' work records, Blaylock's supervisor, Washington, reported that Blaylock has an issue being honest and Washington had no problem with the Company terminating her. (Washington Dep. at 35.) The TIPS employees are simply not similarly situated to Blaylock. *See Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999) (finding that female plaintiff who committed four policy violations was not similarly situated to male employees who each committed single policy violation); *Jones v. Bessemer*, 137 F.3d at 1312-13 (holding that employees who allegedly committed single act of misconduct in one day were not similarly situated to the female plaintiff who had engaged in multiple instances of misconduct on the same day).

Blaylock, therefore, has failed to establish that her military status was a motivating factor in the decision to discharge her. Because Blaylock has failed to establish the threshold elements of a USERRA claim, summary judgment is due to be granted in favor of Alabama Gas. *See Curby v. Archon*, 216 F.3d 549, 556-57 (6th Cir. 2000) (affirming summary judgment for defendants where plaintiff did not meet his burden of showing that his military service was a motivating factor in the employment action at issue); *Sanguinetti*, 114 F. Supp. 2d at 1319 ("[S]ince plaintiff has failed to present a prima facie case of discrimination based upon his military obligations, summary judgment is granted in favor of defendant on plaintiff's USERRA

claim."); *Barreto*, 62 F. Supp. 2d at 392 (granting summary judgment for employer in USERRA

action where there was "no evidence indicative that plaintiff's military status was a motivating

factor for his dismissal."); *Palmatier v. Michigan Dept. of State Police*, 981 F. Supp. 529, 533

(W.D. Mich. 1997) (granting summary judgment in favor of defendants where "[t]he record is

devoid of evidence that plaintiff's military involvement was 'a substantial or motivating factor'

in the minds of defendants . . . as they participated in the decision [at issue].").

Notably, it is further undisputed that Bill Bibb, the ultimate decisionmaker with respect

to Blaylock's termination, and Jim Franklin, another key decisionmaker, never talked to

Blaylock or anyone from the military prior to Blaylock's dismissal. Indeed, Bibb and Franklin

based their decision entirely upon the undisputed reports to them by Powers and/or Bearden that

Blaylock was being dishonest for financial gain. The record is devoid of evidence to suggest

that Bibb and Franklin did not honestly believe what others at Alabama Gas reported to them

about Blaylock.

## C.   **Section 1981**

Blaylock also claims that Alabama Gas terminated her employment because she is

African-American. Blaylock cannot succeed on her race claim without producing evidence that

Alabama Gas acted with discriminatory motive. *See International Brotherhood of Teamsters v.

United States*, 431 U.S. 324, 335 n.15 (1977). A plaintiff may attempt to establish a prima facie

case by direct or circumstantial evidence. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1293

(11th Cir. 1999). Direct evidence of discrimination is "'evidence from which a trier of fact could

conclude, based on a preponderance of the evidence, that an adverse action was taken against the

plaintiff on the basis of a personal characteristic." *Wright*, 187 F.3d at 1288. Blaylock has no

statistical or direct evidence of discrimination, and, therefore, must attempt to prove her case

through circumstantial evidence. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

The law governing disparate treatment cases involving circumstantial evidence is well settled. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Under the *McDonnell Douglas/Burdine* three-step burden shifting framework, a plaintiff carries the initial burden of establishing a prima facie case. *McDonnell Douglas*, 411 U.S. at 802. If a prima facie case is shown, the defendant must then articulate a legitimate, non-discriminatory reason for the employment decision at issue. *Burdine*, 450 U.S. at 253. If this is done, the plaintiff may then attempt to show that the proffered reason was a pretext for intentional discrimination. *Id.* The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Id.*

To establish a prima facie case of discrimination in discipline, a plaintiff must show: (1) that she belongs to a protected group, (2) that she experienced an adverse job action, (3) that her employer treated persons outside of the protected group more favorably, and (4) that she was qualified for her position. *See Jones*, 137 F.3d at 1310. Blaylock's Section 1981 claim fails for two reasons. First, Blaylock has not established a prima facie case of discrimination in termination because she has not shown that similarly situated white employees who engaged in similar misconduct were treated more favorably. Second, even assuming that Blaylock had established a prima facie case of discrimination in termination, she has not established that Alabama Gas's articulated reasons for its actions, including Blaylock's perceived acts of dishonesty, were a pretext for race discrimination.

### 1.    Prima facie Case

Blaylock has not made the requisite showing to establish a prima facie case because she

has not established that she was treated less favorably than similarly situated non-African-

American employees at Alabama Gas.  The Eleventh Circuit reiterated the standard for

determining whether employees are similarly situated in *Silvera v. Orange County School Bd*,

244 F.3d 1253 (11th Cir. 2001).   In reversing the district court's decision to deny defendant's

motion for judgment as a matter of law, the appellate court explained that:

> "In determining whether employees are similarly situated for purposes of
> establishing a prima facie case, it is necessary to consider whether the employees
> are involved in or accused of the same or similar conduct and are disciplined in
> different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311
> (11th Cir). (*quoting Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)),
> opinion modified by 151 F.3d 1321 (11th Cir.1998). "The most important factors
> in the disciplinary context . . . are the nature of the offenses committed and the
> nature of the punishments imposed." *Id.* (citations and quotations omitted). In
> order to satisfy the similar offenses prong, the comparator's misconduct must be
> **nearly identical** to the plaintiff's in order "to prevent courts from
> second-guessing employers' reasonable decisions and confusing apples with
> oranges." *See Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir.1999)
> (citations omitted).

244 F.3d at 1259 (emphasis added); *but see Anderson v. WBMG*, 253 F.3d 561, 565-66 (11th Cir.

2001) (citing the same cases and stating that the law requires only "similar" misconduct from the

similarly situated comparator).

Alabama Gas produced the names and circumstances of any employee who had been

accused of or disciplined for dishonesty (broadly defined) by any of the decision makers since

1995. (Bearden Aff., ¶ 16.)   Out of that group, eight of those disciplined were white, non-

minority employees. (Bearden Aff., ¶ 16.)  Five of the eight white employees, like Blaylock,

were terminated and thus were not treated more leniently. (Bearden Aff., ¶  16.) The three white

employees who were not terminated are the TIPS employees who were suspended for two

weeks. As noted previously, the TIPS employees did not commit the same type of conduct as Blaylock and therefore were not similarly situated.

Blaylock's argument that she can prove her case of discrimination because of the Company's treatment of Joseph Massopust, a white employee who Franklin terminated for viewing internet pornography at work, is not persuasive. Blaylock argues that the Company treated Massopust more favorably because his supervisor, Mickey Raines had counseled him about accessing pornographic material before the termination incident. (Franklin Dep. at 11, 12.) As an initial matter, Massopust's misconduct was not similar to Blaylock's. Additionally, it is undisputed that Raines had no involvement with Blaylock's employment or termination. That Massopust had been warned previously by a totally different decisionmaker, without the knowledge of any one involved in Blaylock's case, is simply not relevant. *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) ("[D]isciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis.")

Blaylock has not shown that similarly situated white employees were treated more favorably than she was for similar conduct. Indeed, the undisputed evidence indicates that Alabama Gas has disciplined and terminated both white and African American employees for making false representations to the Company. (*See* Bearden Aff., ¶ 16; Ex. B thereto). Having failed to establish a prima facie case, Blaylock's Section 1981 claim is due to be dismissed.

### 2. Legitimate, Non-Discriminatory Reason

Even if Blaylock had established a *prima facie* case of racial discrimination, summary judgment is still due to be granted because Alabama Gas has articulated  legitimate, non-discriminatory reasons for discharging Blaylock. Specifically, Alabama Gas terminated Blaylock because of her perceived dishonesty. (Bearden Dep. at 86, 98, 100-101, 118, 121, 217; Franklin Dep. at 27-29, 33-35.)  Three different people requested information from Blaylock

regarding her military earnings for her June duty and all three individuals understood Blaylock to represent that she would not receive an LES and/or separate check for her June duty. (Hudson Dep. at 18-20; DiChiara Aff., ¶ 9; Bearden Dep. at 52, 54, 57-58, 60-61, 74, 77, 109-110.)  After learning from military personnel that Blaylock would, in fact, receive an LES and separate payment covering her June duty (Bearden Dep. at 40, 44-46, 71-73, 77-78; DiChiara Aff., ¶ 11), Alabama Gas concluded that Blaylock was not being truthful about her military earnings and was apparently doing so to avoid the salary offset. (Bearden Dep. at 86, 98, 100-101, 118, 121, 217; Franklin Dep. at 27-29, 33-35.)  In light of her past "pattern of not telling the truth," (Bearden Dep. at 100),  and due to her perceived misrepresentations to the Company about her military pay, Alabama Gas decided to terminate her employment.

Even if Alabama Gas mistakenly understood Blaylock to be misrepresenting her military earnings for her June leave, "an employer who treats two employees differently because of a mistaken belief in the existence of a neutral reason does not violate [the statute]." *Silvera*, 244 F.3d at 1261; *see also Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1339 (11th Cir.2000) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race").  Therefore, even if Blaylock "did not in fact commit the [dishonesty] violation with which [s]he is charged, [Alabama Gas] successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989); *see also Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (that others may have been "lying through their teeth" about the plaintiff's activities is irrelevant as long as the decisionmakers believed plaintiff to be guilty.").

There is no evidence before the court on which a reasonable juror could find that the individuals who made the decision to terminate Blaylock did not have a reasonable and honest

belief that Blaylock was misrepresenting her pay due for military leave.  As the Eleventh Circuit

has often noted:

> [F]ederal courts do not sit to second-guess the business judgment of employers.
> Stated somewhat differently, a plaintiff may not establish that an employer's
> proffered reason is pretextual merely by questioning the wisdom of the
> employer's reason, at least not where, as here, the reason is one that might
> motivate a reasonable employer.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997).

Blaylock has not put forth sufficient evidence of pretext which would lead a reasonable

jury to conclude that the true reason for her termination was her race. Summary judgment,

therefore, is due to be granted as to Blaylock's claims of race discrimination.


## IV. CONCLUSION

Based on the foregoing analysis, the court is of the opinion that Blaylock's Motion for

Summary Judgment is due to be denied and that Defendants' Motion for Summary Judgment is

due to be granted.  Defendant's Motion to Strike is due to be denied as moot.  An Order in

accordance with this Memorandum Opinion will be entered contemporaneously herewith.[9]

DONE this __27th__ day of September, 2002.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

---

[9]Again, even assuming Energen were Blaylock's employer, summary judgment is appropriate
on the merits of the §1981 claim for the same reason it is proper as to Alabama Gas.